# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

ROBIN and DENNY BRUNING, as
parents and next friends of HEATHER
BRUNING, a minor; AGGIE
KUHLMAN, as mother and next friend
of RACHAEL DIXON, a minor; JOEY
and JAMES EVERETT, as parents and
next friends of COURTNEY EVERETT,
a minor,

        Plaintiffs,

vs.

CARROLL COMMUNITY SCHOOL
DISTRICT; STEVE SCHULTZ, both
individually and in his official capacity;
ROB CORDES, both individually and in
his official capacity; and, LEONA
HOTH, both individually and in her
official capacity,

        Defendants.

No. C04-3091-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**


**<u>FILE UNDER SEAL</u>**

—————————————

## TABLE OF CONTENTS

*I.*  *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.*  *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.*  *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*II.*  *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*A. Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*B. Plaintiffs' Substantive Due Process Claim* . . . . . . . . . . . . . . . . . . 31
*C. Plaintiffs' Equal Protection Claim* . . . . . . . . . . . . . . . . . . . . . . . . 31
*D. Plaintiffs' § 1983 Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
*E. Qualified Immunity* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
*F. Plaintiffs' Title IX Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      *1. The District's knowledge of the harassment* . . . . . . . . . . . 34
      *2. Was the District deliberately indifferent to the harassment?* . . 36
      *3. Severity and pervasiveness of harassment* . . . . . . . . . . . . . 38
*G. Plaintiffs' Iowa Civil Rights Act Claims* . . . . . . . . . . . . . . . . . . . . 41
*H. Plaintiffs' Iowa Tort Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
      *1. Immunity under Iowa Municipal Tort Claims Act* . . . . . . . . 44
      *2. Breach of duty to protect plaintiffs* . . . . . . . . . . . . . . . . . 47
      *3. Premises Liability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On December 7, 2004, plaintiffs Robin Bruning and Denny Bruning, on behalf of their daughter, Heather Bruning, Aggie Kuhlman, on behalf of her daughter Rachael Dixon, and Joey Everett and James Everett, on behalf of their daughter, Courtney Everett, filed a complaint in this court against Carroll Community School District ("the District"),

Case 3:04-cv-03091-MWB   Document 134   Filed 04/19/07   Page 2 of 51

Steve Schultz, individually and in his official capacity as the superintendent for Carroll Community School District, Rob Cordes, individually and in his official capacity as the principal of Carroll Middle School, Leona Hoth, individually and in her official capacity as the assistant principal of Carroll Middle School, Steven Kanealy, and his parents Mark Kanealy and Kendra Kanealy. This lawsuit arises from the alleged sexual harassment of Heather Bruning, Rachael Dixon, and Courtney Everett by defendant Steven Kanealy and two other minor students which took place at Carroll Middle School. In Count I of their complaint, plaintiffs allege that defendants, the District, Schultz, in his official capacity, Cordes, in his official capacity, and Hoth, in her official capacity, violated the Equal Protection Clause of the United States Constitution by failing to protect plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett from alleged sexual harassment. In Count II of their complaint, plaintiffs allege that defendants, the District, Schultz, in his official capacity, Cordes, in his official capacity, and Hoth, in her official capacity, violated plaintiffs' Substantive Due Process Rights by allowing defendant Steven Kanealy and two other male students to sexually harass plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett by virtue of the police, practice and custom of the District. In Count III, plaintiffs allege that defendant the District violated Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, by permitting the sexual harassment of plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett by male students to go unchecked. In Count IV, plaintiffs allege that defendant the District violated the Iowa Civil Rights Act, Iowa Code Ch. 216, by permitting the sexual harassment of plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett by male students. In Count V of their complaint, plaintiffs allege that defendants, the District, Schultz, in his official capacity, Cordes, in his official capacity, and Hoth, in her official capacity, violated 42 U.S.C. § 1983 by permitting plaintiffs' rights under the Equal Protection Clause and the Constitution of the

3

State of Iowa to be violated by allowing the sexual harassment of plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett. In Count VI, plaintiffs allege that defendant the District was negligent in permitting the sexual harassment of plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett by male students to occur. In Count VII, plaintiffs allege that defendant the District is liable for allowing on school premises the harm caused to plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett as a result of their sexual harassment at the hands of male students. In Count VIII, plaintiffs allege that defendant the District is liable for the harm caused to plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett as a result of the District's failure to protect them from the sexual harassment by male students. In Count IX of their complaint, plaintiffs allege a claim for assault against defendant Steven Kanealy. In Count X, plaintiffs allege a claim for battery against defendant Steven Kanealy. In Count XI, plaintiffs allege a claim for tortious infliction of severe emotional distress against defendant Steven Kanealy. In Count XII of their complaint, plaintiffs allege a claim for negligence against defendants Mark Kanealy and Kendra Kanealy for their failure to prevent their son Steven Kanealy from harassing, abusing and assaulting plaintiffs Heather Bruning, Rachael Dixon, and Courtney Everett.

On January 26, 2005, plaintiffs filed an amended complaint in this matter in which they reasserted all twelve claims made in their original complaint. In addition, in Count XIII of their amended complaint, plaintiffs allege a slander claim against John DeBolt in his official capacity as the Juvenile Court Officer for Carroll County. Plaintiffs allege that DeBolt made oral statements to the Carroll County newspaper which were slanderous. On April 1, 2005, plaintiffs filed a second amended complaint in this matter in which they reasserted all thirteen claims made in their first amended complaint. On March 22, 2006, plaintiffs filed a third amended complaint in this matter to reflect the dismissal of Steven

4

Kanealy, Mark Kanealy, and Kendra Kanealy from this lawsuit, as well as those claims specifically directed at them. Plaintiffs reassert the remaining nine claims in their second amended complaint against the remaining defendants.[1]

The remaining defendants in this case, the District, Steve Schultz, Rob Cordes, and Leona Hoth, have filed a Motion for Summary Judgment on plaintiffs' claims against them. First, in their motion, defendants assert that the District and the District's personnel's actions or inactions cannot, as a matter of law, support a substantive due process claim. Second, regarding plaintiffs' equal protection claims, defendants contend that plaintiffs' claims fail as a matter of law because defendants did not have a constitutional duty to protect plaintiffs. Third, concerning plaintiffs' claims brought under 42 U.S.C. § 1983, defendants contend that these claims constitute nothing more than reallegations of plaintiffs' equal protection and substantive due process claims. Fourth, defendants Schultz, Cordes and Hoth seek summary judgment as to the claims against them on the ground that they are entitled to qualified immunity. Fifth, the District also seeks summary judgment on plaintiffs' claims brought under Title IX, arguing that plaintiffs have no proffered sufficient evidence on each element of their Title IX claims to survive summary judgment; specifically, that plaintiffs cannot establish that it was deliberately indifferent to their harassment, that it had timely knowledge of the sexual harassment, or that the alleged acts were sufficiently severe and pervasive so as to deprive plaintiffs of access to educational opportunities or benefits provided by the school. Sixth, the District requests summary judgment on plaintiffs' claims against it under the Iowa Civil Rights Act, Iowa Code § 216.9, asserting that plaintiffs have failed to demonstrate that they were

---

[1]Defendant John DeBolt was dismissed from this lawsuit following the court's granting of his motion for summary judgment.

Case 3:04-cv-03091-MWB   Document 134   Filed 04/19/07   Page 5 of 51

denied access to the educational opportunities offered by the Carroll Middle School. Finally, the District also seeks summary judgment on plaintiffs' Iowa state law tort claims for negligence, premises liability and failure to protect; asserting that it was exercising discretionary function in disciplining students and is therefore immune from liability for plaintiffs' tort claims under the Iowa Municipal Tort Claims Act, Iowa Code § 670.4, that it has not breached its duty to protect students from student on student harassment, and that plaintiffs allegations are insufficient as a matter of law to support a claim for premises liability. Plaintiffs have filed a timely response to defendants' Motion For Summary Judgment.

Before turning to a legal analysis of defendants' Motion for Summary Judgment, the court must first identify the standards for disposition of a motion for summary judgment, as well as the undisputed factual background of this case.

### B. Factual Background

The summary judgment record reveals that the following facts are undisputed. Plaintiff Heather Bruning is a resident of Carroll County, Iowa. Heather is a student in the District. Heather is a minor. Her parents are Robin Bruning and Denny Bruning. Plaintiff Rachel Dixon is a resident of Carroll County, Iowa, and is a student in the District. Rachel is a minor. Her mother is Aggie Kuhlman. Plaintiff Courtney Evert is also a resident of Carroll County, Iowa, and a student in the District. Courtney is also a minor. Her parents are Joey Everett and James Everett.

Defendant Carroll Community School District is a school district organized and existing under the laws of the State of Iowa. The District operates Carroll Middle School in Carroll, Iowa. Defendant Rob Cordes is a resident of Carroll County, Iowa and was principal of the Carroll Middle School. Defendant Leona Hoth is a resident of Carroll

6

County, Iowa, and was assistant principal of the Carroll Middle School. Defendant Steven Schultz is a resident of Carroll County, Iowa, and was the District's superintendent of schools.

In August of 1994, Carroll Community School District adopted an official policy regarding student-on-student sexual harassment. The Carroll Community School District's Newsletter for October 2001 included a section on harassment. The article read as follows,

### Harassment of Students by Students
### (See CCSD Board Policy 502.1.1)

> It is the policy of the Carroll Community Schools to maintain a learning and working environment that is free from harassment. It shall be a violation of this policy for a student to harass other students or staff through conduct of a sexual nature or conduct designed to reduce the dignity of that individual with respect to race, color, creed, religion, national origin, gender, age, disability, marital status, or any other form of harassment. Violations of this policy or procedure will be cause disciplinary action up to and including expulsion. Students who believe they have suffered harassment shall report such matters in a timely manner to a teacher, a counselor, or a building administrator.

Carroll Community School Newsletter at 1, Plaintiffs' App. at 420 (emphasis in original).

The Carroll Middle School Student Handbook contains the following provision concerning harassment:

> HARASSMENT (See CCSD Board Policy 502.1.1)
> Our society and community standards do not condone harassment, intimidation, extortion, or any other similar kinds of action by one student toward another. The warning against this behavior also specifically includes unwelcome sexual advances, one person touching another in a sexually related way without permission or against the other's will, slanderous

7

> remarks made against another student, or written material in
> the form of libel. Students found treating others in any
> manner as previously described will be subject to severe
> disciplinary action.

Carroll Middle School Student Handbook at 9, Plaintiffs' App. at 324. This paragraph on peer sexual harassment is the only reference in the middle school student handbook to sexual harassment. Although students have the opportunity to look at the board policy if they need more information, in the four years that Hoth was the assistant principal, no student ever came in to talk to her about looking at the board policies for sexual harassment. The teachers are directed to go through the entire handbook with students during their home room period at the beginning of the year.

Principal Cordes recalled that Carroll Community School District Board Policy 502.1.1 was the peer harassment policy prior to July of 2003, and that policy 502.8 replaced 502.1.1 in July of 2003. Carroll Community School Board Policy 502.1.1, set forth in part above, states that a student who is harassed is to "communicate to the harasser that you expect the behavior to stop. May do so verbally or in writing. If this is too difficult to do alone, seek help from a teacher, counselor, or principal who you trust." Carroll Community School Board Policy 502.1.1 at 1, Plaintiffs' App. at 358. Policy 502.1.1 also states, in relevant part, that "[s]chool employees shall be responsible for promoting understanding and acceptance of, and assuring compliance with, state and federal laws and board policy and procedures governing harassment within the school setting." Carroll Community School Policy 502.1.1 at 1, Plaintiffs' App. at 358.

Carroll Community School Board Policy 502.8 states that "[s]tudents whose behavior is found to be in violation of this policy will be subject to the investigation procedure. . . ." Carroll Community School Board Policy 502.8, Plaintiffs' App. at 316. It further states that: "[r]etaliation against a student because the student has filed a

8

harassment complaint. . . is also prohibited." Carroll Community School Board Policy 502.8, Plaintiffs' App. at 317. It also states that: "The superintendent will also be responsible for organizing training programs for students and employees. The training will include how to recognize harassment and what to do in case a student is harassed." Carroll Community School Board Policy 502.8, Plaintiffs' App. at 317. Superintendent Schultz's training consisted of reviewing the policies and giving examples. Hoth "can say during the four years that [she] was here, the board policy was the focus of how [teachers] learned of sexual harassment, how it was defined, how to respond." Hoth Dep. at 43, Plaintiffs' App. at 119.

Carroll Community School Board Policy 503.1R1(II)(P), which also concerns harassment, reads:

> Harassment on the basis of race, color, creed, religion, national origin, gender, age, disability, or marital status means conduct of a verbal or physical nature that is deigned to embarrass, harry, distress, agitate, disturb, or trouble persons when:
> 1.  Submission to such conduct is made directly or indirectly a term or condition of an individual's employment or education.
> 2.  Submission to or rejection of such conduct by an individual is used as the basis for academic or employment decisions affecting that individual.
> 3.  Such conduct has the purpose or effect of substantially interfering with an individual's academic or professional performance or creating an intimidating, hostile, or offensive employment or education environment.

Carroll Community School Board Policy 503.1R1(II)(P), Plaintiffs' App. at 538.

Carroll Community School Board Policy 503.1R1(III) provides, in relevant part, that:

9

Students who violate the regulations or rules established by the Board including breach of discipline as defined by this policy, or who have documented cases of conduct detrimental to the best interests of the District may be suspended or expelled from school or otherwise disciplined as provided by this policy.

The principal/designee may refer a student for counselor intervention and a behavior modification plan at any point within the enforcement procedure.

The principal/designee in each attendance center shall have the authority, after proper investigation of the fact, to suspend students temporarily. Expulsion shall be by majority vote of the Board upon the recommendation of the administration. The following responses to breaches of discipline may be utilized after appropriate investigation of the facts:

A.  Detention. Detention shall be the requirement that a student remain after school or come to school early, as stated in the student's individual attendance center handbook, for purposes of discipline.

B.  Removal from class. Removal from class is that period of time a student is sent from the classroom by the teacher to the office of the principal/designee for the period of time not to exceed one (1) day. The principal/designee shall review with the student and classroom teacher the misconduct and determine the conditions for re-admission to class or any further disciplinary proceedings.

C.  Probation. Probation is conditional attendance during a trial period imposed for conduct which violates the regulations or rules established by the Board, including breach of discipline as defined in the discipline policy, or for cases of conduct detrimental to the best interests

10

of the school.  Breach of conditions of probation may result in more severe sanctions.

D.      In-school Suspension.  In-school suspension is the temporary isolation of a student from one or more classes while under proper administrative supervision. In-school suspension may be imposed by the principal/designee for violation of school rules or policies (including the discipline policy) where the infraction does not necessarily warrant removal from school by suspension.

E.      Removal from a specific class for the remainder of the semester.  Removal from a specific class for the remainder of the semester is isolation of a student from a specific class while under proper supervision and is a permanent in-school suspension for the semester from that class where the student's conduct does not warrant expulsion from school.

F.      Temporary Suspension.  Temporary suspension is that period of time not to exceed ten (10) school days that a student is sent home from school for any breach of discipline as covered in Section II of this policy.  The principal/designee in each attendance center shall have the authority, after appropriate investigation of the facts, to suspend students and determine the level of suspension.  A suspended student shall be given the opportunity to make up work and receive credit on the same basis as other absentees.  Suspended days are to be counted as absences.  The initiative to make up work must be made by the student.   The building principal/designee shall attempt to hold a conference as soon as practicable with the parent(s)/guardian(s) to discuss the reasons for suspension.

Carroll Community School Board Policy 503.1R1(III), Defendants' Supp. App. at 233-34.

11

Although the State of Iowa requires schools to review their policies every five years, the Carroll School Board Policy Review Committee has reviewed and revised this policy every three years since its adoption, including August of 2003. All school district staff members received mandatory training on this policy on August 20, 1997, August 21, 2000, and August 21, 2003. Each school building principal reviews the harassment policy with the respective staff members annually. At this annual meeting with staff, Cordes had a practice of stressing the importance of being vigilant during the time between class periods in the hallways. The school also has an Level I investigator who is trained to handle cases of sexual harassment.[2]

The Carroll Community School District maintains an official procedure for students

_____

[2]Gary Bengtson, a Level I investigator, was the designated investigator for student-to-student harassment since the student-on-student sexual harassment policy was implemented in 2000 or 2001. Bengtson knew that he was the designated investigator because it was brought up at the re-organizational board meeting every year. As the director of business affairs, Bengtson is not directly involved with students. In all the years he has been the designated investigator, he has never been involved in any investigation of student-on-student sexual harassment. Had Bengtson ever been called on to perform an investigation as the designated peer-on-peer investigator under the school policy, he would have conducted it in the same manner as he would a Level One Investigation. He would have brought in the student who complained and would have talked to him or her. He would have also talked to any witnesses who were involved. In addition, he would bring in anyone with knowledge of the incident and interview them to see if their stories meshed or corroborated each other's stories. If the witnesses had no objections, he would tape the statements. When the investigation was complete, he would have filed a written report. Understanding the difference in age when dealing with students, the only way Bengtson would vary his procedure when dealing with student-to-student harassment would be to reassure the students that nothing was going to be held against them and that nobody was going to retaliate against them. Bengtson's final step would be to inform the principal regarding whether of not he believed that the harassment had ocurred.

to follow in reporting sexual harassment, which is similar to the policy set out by the Iowa School Board Association. When a student contacts Ethel Watson, the Guidance Counselor at Carroll Middle School, regarding harassing behavior, she ascertains whether the student has told the harassing individual that the student finds the behavior offensive and has asked the other student to stop. Watson would follow up with the principal after consulting with the alleged victim. In most cases the school district's sexual harassment policy is a three-strikes disciplinary policy with detention, in-school suspension, or a letter home to the student's parents for the first offense, out-of-school suspension for the second offense, and possible expulsion for the third offense. It is not the school's policy to tell the victim the discipline that was doled out to the alleged harasser. At the commencement of each school year, students receive a student handbook/daily assignment calendar which contains information on student sexual harassment and this information is discussed with the student's home room teacher at this time. Guidance Counselor Watson taught a unit on sexual harassment in the Leadership Training Class, which is part of the required curriculum for all seventh graders at Carroll Middle School. This unit included instructions on how to seek help and report sexual harassment.

In August 2001, plaintiffs Heather Bruning and Rachael Dixon enrolled as sixth grade students at Carroll Middle School. In August of 2002, plaintiff Courtney Everett enrolled as a seventh grade student at Carroll Middle School. In the fall of 2002, plaintiffs Rachael Dixon, Courtney Everett, and Heather Bruning, as well as Steven Kanealy, Chris Barthman, and Jerry Letze, entered the seventh grade at Carroll Middle School. Plaintiffs Rachael Dixon, Courtney Everett, and Heather Bruning were friends with Steven Kanealy, Chris Barthman, and Jerry Letze. Rachael Dixon and Jerry Letze considered each other to be boyfriend and girlfriend for a period during seventh grade. Heather Bruning considered Steven Kanealy to be her boyfriend several times during seventh grade.

13

Courtney Everett considered Chris Barthman to be her boyfriend for approximately one month in the spring semester of seventh grade. Rachael Dixon, Courtney Everett, Heather Bruning, Steven Kanealy, Chris Barthman, and Jerry Letze visited each other's homes and went to the park, school dances, and movies together. These students also spent time together in school; "hanging out" at recess, and sitting by each other in the lunchroom and on the bus.

In the fall of 2002, Jerry Letze grabbed Rachael Dixon's breasts, grabbed her buttocks, kicked her buttocks, poked her in her "lower private areas", kicked her, spat on her, pulled her hair, scratched her in the neck with staples and gave her "titty twisters." In the seventh grade, Rachael rode the bus with Steven Kanealy and Jerry Letze. Steven and Jerry would often pull Rachael's head down to their crotches and throw spitballs at her. Also while in the seventh grade, Steven Kanealy tripped Rachael, gave her "titty twisters," grabbed her breasts and buttocks, and poked her buttocks and genital area with pens and pencils. In addition, Chris Barthman gave Rachael "titty twisters," shocked her shoulders, poked her crotch area with pens and pencils, kicked her buttocks and grabbed her buttocks and breasts.

The first time Heather Bruning remembers being sexually harassed at school was in the hallway in the fall of 2002 when she was in the seventh grade. A male student, Steven Kaneally, grabbed her breasts. Also in the fall of 2002, another male student, Jerry Letze grabbed Heather's chest and buttocks inside of the school "daily or every other day." Heather Bruning Dep. at 41, Plaintiffs' App. at 143. Jerry also spat, kicked and did everything Steven Kanealy did. Jerry's actions included grabbing Heather's breasts and buttocks, spitting, tripping and kicking, pulling hair and calling her names such as "slut" and "whore."

In the fall of 2002, Steven Kanealy, Jerry Letze, and Chris Barthman, another male

14

student, gave Heather Bruning "titty-twisters." Heather saw Jerry Letze also grab the breast of Rachael Dixon, and Courtney Everett, as well as the breasts of N.B., N.L., A.A. and K.K. Steven Kanealy, Jerry Letze, and Chris Barthman attempted to cut Heather's neck with staples and Steven scratched her during recess. Heather has indicated that these actions occurred in school hallways, at recess, in class, near the drinking fountain, in the gym room, and outside of the school.

Steven Kanealy, Chris Barthman, and Jerry Letze would put their legs between Heather Bruning, Courtney Everett, and Rachael Dixon's crotches during lunch and look under the table to see between the girls' legs, grab the girls' chests, take the girls' food at lunch and throw food at the girls at lunch. Heather also had problems with Steven Kanealy, Chris Barthman, and Jerry Letze on the school bus. Steven Kanealy would ask her inappropriate sexual questions, grab her buttocks, bite her chest, spit on her, and lift her skirt. Jerry Letze grabbed her chest and buttocks, kicked her, and did everything Steven Kanealy did to her and, in addition, called her "slut" and "whore." Chris Barthman did the same things to her that Steven Kanealy and Jerry Letze did, including grabbing her chest and buttocks, spitting on her, kicking her, tripping her, pulling her hair, and calling her names.

Steven Kanealy admitted in his deposition that he gave Rachael Dixon, Courtney Everett, and Heather Bruning "titty twisters", poked them in the chest with pens, called them names, spat on them, tripped them, pointed laser pointers at their private parts and shoved their heads toward his groin. Steven Kanealy testified that the girls would initiate inappropriate behavior by giving "titty twisters"and spitting on the boys.

Rachael Dixon, Courtney Everett, and Heather Bruning "racked" Chris Barthman in the groin and would call him names in response to names he called them. Chris Barthman testified that everyone in his class gave one another "titty twisters." Jerry Letze

15

testified in his deposition that Rachael Dixon, Courtney Everett, and Heather Bruning would hit him in the "nuts" and call him names, including, "asshole, prick, short dick." Jerry Letze Dep. at 8, Defendants' App. at 168. He testified that he getting hit in the "nuts" by Rachael Dixon, Courtney Everett, and Heather Bruning was so painful that it caused him to bend over. He also testified that sometimes the boys would initiate the behavior and sometimes the girls would initiate it.

Rachael Dixon, Courtney Everett, and Heather Bruning admitted to calling Steven Kanealy, Chris Barthman, and Jerry Letze names, and kicking the boys in the groin. Heather Bruning testified that, "If they did things to us, we did things back at them." Heather Bruning Dep. at 262, Defendants' App. at 109.

Principal Cordes typically monitored the lunchroom at Carroll Middle School. On occasion, Assistant Principal Hoth would act as the monitor. During her seventh grade year, Heather Bruning never complained to the lunchroom monitor about problems in the lunchroom. During the first semester of seventh grade, she did not report Steven Kanealy's alleged harassment to anyone at Carroll Middle School, or to Steven Kanealy's parents.

Cordes and Hoth also monitored Carroll Middle School students during recess. When inappropriate acts were done duing recess, none of the students involved told the recess monitor. The practice at Carroll Middle School was to have teachers step out of the classrooms to monitor the hallways between classes.

Heather Bruning testified in her deposition that when Steven Kanealy began to harass in the seventh grade, the harassment usually occurred in the hallways. Rachael Dixon, Courtney Everett, and Heather Bruning never reported the alleged sexual harassment to the hallway monitors. Heather Bruning also testified in her deposition that although she cried on the school bus approximately ten times, she never told the bus driver

that she was being sexually harassed.

In the fall of 2002, during the seventh grade, Heather Bruning has no knowledge of any school official witnessing any of the alleged sexual harassment, including having her breasts grabbed, her being bitten or spat on, or having her skirt lifted up with a stick on the school grounds. Although Heather Bruning testified that Cordes saw Steven Kanealy grab her breast near the drinking fountain in the hallway, Cordes denies ever witnessing any such occurrence.

Heather Bruning also testified that Hoth witnessed the boys trying to trip her and grab her chest during recess. Heather Bruning also admitted that the boys did not actually trip her and that while Hoth was watching another student came up to Hoth and talked to her. Hoth denies ever witnessing any sexually harassing behavior during recess or during her monitoring activities. Bus driver Gene Neppl never saw anything beyond ordinary horseplay.

Steven Kanealy admitted that he tried to avoid getting caught when engaging in inappropriate behavior by being out of view of adults and hiding his actions. For example, Heather Bruning admitted that when inappropriate behavior occurred in Mrs. Bogue's science class, Bogue would either be out of the classroom or talking to another student.

Rachael Dixon, Courtney Everett, and Heather Bruning continued to "hang out" with Steven Kanealy, Chris Barthman, and Jerry Letze even after the harassment had begun. They continued to sit together the majority of the time in the cafeteria during lunch. Heather Bruning admitted to voluntarily sitting on the bus with Steven and the other boys.

In the Spring of 2003, the girls that were being harassed at the Carroll Middle School did not really talk about the sexual harassment and assault because, as Rachael Dixon characterized it, "we all knew what was happening and we all knew it was wrong.

17

There was nothing really to say." Rachael Dixon Dep. at 77, Plaintiff's App. at 172.
Rachael Dixon and Courtney Everett, at the suggestion of another female student, K.L.,
decided to report the harassment they had been experiencing to Ethel Watson, the guidance
counselor. Courtney's school calendar reflects that she met with Watson on April 2, April
3, and twice on April 8, 2003. Courtney usually went with Rachael when Rachael had
meetings with Watson. Courtney, Rachael, and two other girls, K.L. and A.E. met with
Watson and  Rachael "told [Watson] some of the things that had been happening and by
who."   Rachael Dixon Dep. at 75, Plaintiff's App. at 172.   She told Watson that three
boys, Steven Kanealy, Jerry Letze, and Chris Barthman, were the ones who did things to
her. During the first few visits, Rachael reported acts of harassment such as being tripped,
spat on, and having her hair pulled. Rachael gave Watson permission to speak with the
alleged harassers but did not want her to report her complaints to the school's
administration. Watson talked to Steven Kanealy and Jerry Letze, telling them that their
conduct was inappropriate, would not continue, and if it did they would be reported.
Watson reported  the harassing conduct in general terms to Cordes and told him to be
watching for it.  Watson also told Leona Hoth to be on the lookout for inappropriate
behavior going on during lunch.  The girls' parents were not contacted.  Although Watson
tries to respect the student's right to confidentiality, she will break confidentiality for
safety and other issues.

        Although at first Courtney denied being a victim of any harassment at that time, she
acknowledged that she had witnessed inappropriate behavior. Courtney said that she was
just there because she had seen what was happening to the other girls. At another meeting,
Watson wanted to know if Courtney was really just someone who saw these things, or if
these things were really happening to her as well.  Courtney admitted that these things
were happening to her as well.

At some point during their meetings with Watson, Rachael Dixon, K.L. and A.E. told Watson that Steven Kanealy, Chris Barthman, and Jerry Letze were poking them in the chest, giving them "titty twisters", grabbing at and actually grabbing their buttocks, calling them names such as "slut," "bitch," "Whore" or "Ho," camel-toe," "pussy," "wrinkle ass," pointy titties," "MILF," and "lesbian" or "lesbo." This conduct was largely occurring during recess. Rachael remembers Watson being "astonished" when the girls told her what was happening to them. Watson immediately went to find the named harassers. Watson learned that Cordes was already meeting with the boys to discuss the behavior. Watson then went to teach a class and later came back to Cordes, who told her "it had been taken care of." Watson Dep. at 46, Plaintiffs' App. at 97. Cordes's follow-up with the boys related to the boys' "titty twisting" the girls.

Through her conversations with Watson, Hoth was familiar with Watson's meeting with Rachael Dixon and Courtney Everett in April of 2003. Although unsure about the specific time line of events, Hoth recalls that, at some point in 2003, Watson told her about some inappropriate actions taken by two or three boys in the district toward some girls and that the boys' actions included name calling and touching of a sexual nature. Hoth was aware of Rachael's complaints because Hoth and Watson's offices were next to each other. Hoth cannot imagine that she failed to share what she knew from Watson with Cordes because the allegations were "shocking." Hoth Dep. at 75, Plaintiffs' App. at 126.

Cordes believes that "physical touching of a male student to a female student to be more serious than name calling" and in the spring of 2003, Cordes knew that there was an allegation of physical touching. Cordes Dep. at 16, Plaintiffs' App. at 63. If a student went to a counselor or teacher to complain about sexual harassment, that employee is to report the information to Cordes because, as principle, he is supposed to get this information. In April of 2003, Watson made Cordes aware of two sexual harassment

19

complaints, one from Rachael Dixon and one from another girl. Watson did not inform plaintiffs that under Policy 502.1.1, that they had a right, if the behavior was repeated, to go to a higher authority.

Watson herself has never personally been involved in a sexual harassment investigation at the school but instead gathers information and gives notes to Cordes. Cordes admits that it is Watson's duty to disclose to him fully what information she has relative to a complaint of sexual harassment. Cordes admits that Watson told him that there was a student calling the girls "sluts" and "bitches." Cordes knows that calling someone a "bitch" or slut" or "whore" is sexual harassment. Cordes also admits that in the spring of 2003, Watson reported to him that the girls reported that "boys" were poking them in the breast area and calling them inappropriate names. Cordes is unsure how many times Watson talked to the girls who complained, but he knows that is was at least once.

Principal Cordes visited with Steven Kanealy and Steven admitted to calling the girls names but denied poking them in the breasts. Cordes admits that a denial of the complaint to poking the girls in the breast "most times" would lead to further investigation but Cordes felt that Steven had already admitted to violating the sexual harassment policy through the name calling, so Cordes made Steven's parents aware of the complaints through a letter dated April 4, 2003, which stated:

> Recently I have had some reports of students pinching and poking each other in the chest/breast. Steven's name came up as a person doing some of the pinching and poking. This type of behavior is inappropriate and unacceptable.
>
> In addition, some of the students have been talking about topics of the [sic] sexual nature that are inappropriate at school. When I met with Steven, he was honest with me about his involvement. I have given all students involved a warning for their actions. I also informed them that this type of

20

> behavior needed to <u>STOP</u> immediately.
>
> I am enclosing a copy of the harassment policy. Please review the entire policy with Steven.
>
> Thank you for your assistance in this matter.

Cordes letter of April 4, 2003, at 1, Plaintiffs' App. at 416 (emphasis original). Although Cordes admits that he had contact only with Steven Kaneally because his was the only name he had in the spring of 2003, Jerry Letze admits he "titty-twisted" Rachael and Heather in the seventh grade and that Cordes told him that such actions were inappropriate and not to be engaging in such activity, against either a boy or a girl. Jerry cannot remember how long he met with Cordes in seventh grade, but is was probably less than half an hour.

There is no requirement that a complaint of sexual harassment must be in writing, it may be oral. The protocol for investigating a complaint of sexual harassment starts with a complaining student, or counselor, teacher, or other staff person to whom the student has gone. Hoth never spoke directly with the girls about their reports. She admits that she does not believe any investigation took place in the spring of 2003 and knew only that Watson was trying to counsel the girls to talk to their parents and "to get the behaviors to stop." Hoth Dep. at 15-16, Plaintiffs' App. at 112.

Cordes admits that he never interviewed the girls after hearing Watson's report concerning the girls' allegations of sexual harassment and assault. Cordes also did not question and never sent anyone else to question the girls about the allegations the boys were making about them. Cordes did not inform either Rachael's parents or any of the other girls' parents about the complaints the girls were making in the spring of 2003, although there was not a school policy that would have prohibited Cordes from doing so.

21

Cordes believed that when a child was physically touched, and he did not take a statement, it was "usually" the responsibility of the person who takes the statement to make the decision of whether or not to contact the parents. Cordes Dep. at 16-17, Plaintiffs' App. at 63.

Hoth is unaware "of any sort of rule, law, or any other authority that would prevent her, as an administrator, from reporting to parents if their child had been inappropriately touched at school." Hoth Dep. at 64, Plaintiffs' App. at 123.

At a subsequent meeting with Watson, Watson told Rachael and Courtney that she had talked to the boys and she had been told that the girls were "participating" in the harassment by also giving "titty twisters" to the boys. Watson was disappointed and irritated that the girls didn't tell her about their part in the titty twister incident. The girls had made it seem like one-way conduct versus it being both ways. Rachael told Watson that after awhile, the girls would get fed up with the boys' harassment and assaults, and they would hit the boys back to defend themselves. Watson cannot remember if she ever told the girls their complaint had been "handled." Letting the girls know if or how the boys had been disciplined was "not school policy really" because of confidentiality that applied equally to the boys as the girls. Watson Dep. at 66, Plaintiffs' App. at 101.

Watson admits that prior to April of 2003, but during the same school year, she received complaints of sexual harassment from other female students but could not estimate the number of times. The majority of the complaints involved the calling of names and a few concerned touching. Each day, each grade level team has a planning period together. During that period on any day, Watson, Cordes, or Hoth could visit with teachers to make them aware and vigilant of any issue. Hoth was not present at any meeting in the spring of 2003 where the complaints of the girls were discussed nor did any teacher tell her about a meeting where the complaints were discussed.

22

In May of 2003, when Cordes was confronted with a complaint of male on male harassment in which some male students were pinching each other at recess. In response, Cordes told the male students that "that behavior was inappropriate, that behavior was harassment, and it needed to be stopped." Cordes Dep. at 7, Plaintiffs' App. at 61.

Steven Kanealy recalls that he was told about sexual harassment at the beginning of the seventh grade year when they went through the student handbook and that it was "very not tolerated." Kanealy Dep. at 18-19, Plaintiffs' App. at 182. He also admitted that he knew what he was doing to the girls was sexual harassment, "to a point", but it did not cross his mind that he was sexually harassing the girls. Jerry Letze recalls that he had training on sexual harassment when they went through the handbook at the beginning of the seventh grade, and he may have had training in guidance but he could not remember. Chris Barthman does not remember any kind of knowledge or anybody talking to him about sexual harassment in the seventh grade. He remembers that in the seventh grade, Rachael Dixon, Courtney Everett, and Heather Bruning told him, Steven and Jerry to stop pinching and doing sexual things to them.

On September 5, 2003, the Carroll Middle School mailed a newsletter to all middle school parents. Attached to the newsletter was a copy of the Carroll Community School District Policy 502.8, concerning harassment. The newsletter encouraged parents to review the policy and to talk to their children about harassment. No parent ever contacted Cordes about this policy after it was sent out in the newsletter.

In the eighth grade, Courtney Everett participated in football cheerleading and Rachael Dixon participated in football and basketball cheerleading as well as track. Rachael told Watson that no inappropriate touching or behavior was happening in the school. Watson advised Rachael that if such conduct began again, she was to tell Watson.

On September 25, 2003, the school had a "dress up day." On Thursday, October

23

2, 2003, two eighth grade female students reported to Watson that inappropriate behavior had occurred on the September 25th dress up day. They reported such conduct as flipping up skirts, pulling down a girl's shirt, and poking at vaginas with pencils. The reporting girls were laughing about the behavior. Watson immediately advised the eighth grade teachers at their team meeting to be on heightened awareness for such inappropriate behavior. Watson told Cordes, "We have a sexual harassment case coming. . ." Ethel Watson Dep. at 79, defendants' app. at 192. There was no school that Friday. On Monday, October 6, 2003, Watson called Rachael Dixon, Courtney Everett, and Heather Bruning into her office to discuss the "dress up day" behavior. Watson sent passes to the students' teachers for the meeting. Watson stated that as a school "we" were not going to tolerate the harassment, and "so confidentiality was going to go because I was going to report it to Mr. Cordes and it would be handled and I would turn it in on what the other girls had said if they didn't want to share any more." Watson Dep. at 81, Plaintiffs' App. at 104. This meeting was the first time that Heather Bruning had told any school official about the alleged sexual harassment. The girls waived the right of confidentiality at this meeting. Watson advised the girls to tell their parents and then told them that she would check with them the next day, Tuesday, October 7, 2003, to make sure the girls did so.

On Tuesday, October 7, 2003, Watson met with Rachael Dixon, Courtney Everett, another girl, and possibly Heather Bruning. Rachael and Courtney had not yet told their parents. Watson had Rachael call her mother either that day or on Wednesday. This was the first time Robin Bruning heard inappropriate behavior was occurring on school grounds. Courtney stated that she didn't want to tell her parents because she was not being sexually harassed.

Robin Bruning then contacted Watson, inquiring about setting up a meeting with the girls. Watson advised Robin Bruning that she would not meet with Robin and the group,

because such a meeting would invade the girls' rights, unless the other parents were there as well. Watson and Robin Bruning set up a meeting with Cordes and Heather Bruning to be held the following day. On Wednesday, October 8, 2003, Watson, Robin and Heather Bruning, and Cordes met. During this meeting, Cordes gave Robin Bruning a copy of the sexual harassment complaint form.

Sometime during this week, Cordes heard complaints about a shocking pen being used to shock students. Within an hour of hearing the report, Cordes had confiscated the pen. Chris Barthman, the student who possessed the pen, was given a verbal reprimand and suspended for bringing such a device to school. In addition, he was required to write an apology letter to the girls in the eighth grade.

On October 8, 2003, Rachael Dixon filed an official sexual harassment complaint with the school. On October 8, 2003, Cordes interviewed Steven Kanealy, who admitted to pinching breasts at recess and admitted that he had done that with Rachael and Heather the prior school year at recess and had poked girls in the breasts with pencils, had hit girls in their "butts" with binders, had pinched the backs of girls' arms, had poked and kneed them in their "butts" and had tried to grab girls' private areas. On October 9, 2003, Cordes interviewed Jerry Letze and Jerry admitted that he had done the following to Heather, Rachael, and others: he had poked "pencils in butt," poked girls in their sides, kneed Rachael in her "butt," grabbed a girl in her private areas, tried grabbing Heather and Rachael's crotches and had talked "about sex related stuff." Cordes Notes at 242-43, Plaintiffs' App. at 365-66.

On October 9, 2003, Courtney Everett also filed an official sexual harassment complaint with the school. On this date, Watson met with Rachael, Rachael's mother, Robin and Heather Bruning, as well as another girl and her mother. Watson got the impression that the inappropriate behavior had begun in April of 2003. Watson did not

meet with Rachael Dixon, Courtney Everett, or Heather Bruning again. Watson was informed by Courtney that the girls had been instructed that they were not allowed to speak to Watson anymore.

On October 9, 2003, Cordes held a conference with Steven Kanealy's parents. On October 10, 2003, Cordes sent a notice to Steven's parents regarding his in-school suspension. The Carroll Community School District investigated the accusations it had received and suspended Steven Kanealy, Chris Barthman, and Jerry Letze for three days, pursuant to the school's offical policy on student-to-student sexual harassment.

For activities that occurred outside of school in the summer of 2003, Steven Kanealy, Chris Barthman, and Jerry Letze were charged with burglary in the first degree, false imprisonment, and three counts of assault in October 2003. On October 14, 2003, following the filing of the complaints against the three students and the police becoming involved, Cordes arranged to have the accused harassers' schedules changed so that they did not have classes with the alleged victims. The students' bus routes were also changed and Cordes held a meeting with the eighth grade school teachers during which he advised them to keep a closer eye on matters.

In December of 2003, the juvenile probation officer recommended that a delinquency petition be filed against the three boys but the county attorney denied that request. Also in December 2003, Robin Bruning complained that Steven Kanealy continued to harass Heather Bruning during study hall.

On December 11, 2003, Robin Bruning contacted Cordes and expressed concerns to him, so Cordes asked Robin to write a letter. Robin hand-delivered this letter to Cordes on the same day. In her letter, Robin reported that the three boys were spreading rumors and lies about the girls and that the boys were stating that the girls were making up their claims. Robin reported that Heather was being made fun of at school for being a "tattle-

tale." She reported that Steven was in Heather's fifth period study hall and that, when the teacher wasn't looking, Steven would throw pens and pencils at her and call her "nasty names" out loud in front of the class. When the kids laughed, Heather would try to make a smart comment back or brush it off and pretend that it did not bother her, but it was affecting her. In the halls, Steven would pass by her and call her "ho" or other derogatory names. Heather was concerned that Robin's report would make things worse instead of better and that Steven would continue his actions. Robin also reported in the letter that the girls were in counseling because of what had happened.

On December 12, 2003, Cordes and Superintendent Schultz took Heather out of the library to investigate Robin's claims. Notes of this interview reflect that Heather "[j]ust wants [Steven] gone." The notes also reflect that Heather had heard Steven talking to others about her, and that "[redacted] has talked about Heather's boobs." Notes at 244, Plaintiffs' App. at 367. Cordes received independent verification that Steven had talked about Heather's "boobs," confirmed Robin's statement that Heather tried to laugh it off, and confirmed that pencils and pens were being thrown in study hall. Cordes changed Steven Kanealy's study hall schedule. Also on December 12, 2003, Cordes wrote a letter to Steven's parents, indicating that his study hall had been changed and that he was to have no contact with the student to whom he was making inappropriate comments. The letter further stated:

> This letter is to inform you that Mr. Trullinger and I visited with Steven about allegations that Steven made inappropriate comments to a female student during study hall. I have moved Steven to a different study hall so he and the female student are not in any classroom together.
>
> I have informed both students that they are not to have any contact with each other. They are not to talk about one

27

another to other students.

Cordes's letter of December 12, 2003, at 1, Plaintiffs' App. at 418.

On December 22, 2003, a mutual no contact order was entered regarding Steven and Heather. Steven Kanealy was taken out of school for approximately one month, after which he was transferred to Carroll High School for the remainder of his eighth grade year. The inappropriate behavior and alleged sexual harassment on school grounds by Steven Kanealy, Chris Barthman, and Jerry Letze then stopped.

In October 2004, Heather was still being bothered or touched by unnamed male students at high school and was struggling emotionally and had started getting counseling. On October 12, 2004, Robin went to the high school to discuss the idea that Heather might go to alternative school, because the harassment she had received at the middle school was still continuing at the high school. On October 13, 2004, Steve Haluska, the principal of Carroll High School, met with Heather and requested the names of the harassers. Heather refused because she believed that her harassers would retaliate against her. Heather later relented and revealed that A.L. and T.G. were harassing her. Heather reported that one of these boys had grabbed her breast in class and said something to her, but she did not remember what was said.

Heather Bruning requested to be transferred to the alternative school. On October 21, or 22, 2004, it was decided that Heather would go to the alternative school in the morning and high school in the afternoon. Also in the fall of 2004, Courtney Everett was transferred to the alternative school at her request.

Rachael Dixon participated in track during her ninth grade year but quit due to stomach and headache problems. Rachael participated in cheerleading during her seventh and eighth grade years, and intended on auditioning for the squad during her sophomore year.

28

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. *Fed. R. Civ. P.* 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920

29

F.2d 1402, 1405-06 (8th Cir. 1990)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," i.e., are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway*

*Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994). Consequently, with these standards in mind, the court turns to consideration of the parties' arguments for and against summary judgment in this case.

### B. Plaintiffs' Substantive Due Process Claim

Defendants initially seek summary judgment on plaintiffs' substantive due process claim, asserting that the District and the District's personnel's actions or inactions cannot, as a matter of law, support such a claim. Plaintiffs do not resist this portion of defendants' motion. Therefore, this portion of defendants' motion for summary judgment is granted.

### C. Plaintiffs' Equal Protection Claim

Defendants next seek summary judgment on plaintiffs' equal protection claims, contending that plaintiffs' claims fail as a matter of law because defendants did not have a constitutional duty to protect plaintiffs. Again, plaintiffs do not resist this portion of defendants' motion. Therefore, this portion of defendants' motion for summary judgment is also granted.

### D. Plaintiffs' § 1983 Claims

Defendants also seek summary judgment on plaintiffs' claims brought under 42 U.S.C. § 1983 on the ground that those claims are nothing more than reallegations of plaintiffs' equal protection and substantive due process claims. Plaintiffs also do not resist this portion of defendants' motion. Therefore, this portion of defendants' motion for summary judgment is also granted.

31

### E. Qualified Immunity

Defendants Schultz, Cordes and Hoth further seek summary judgment as to the claims against them on the ground that they are entitled to qualified immunity. Plaintiffs do not resist this portion of defendants' motion. Therefore, this portion of defendants' motion for summary judgment is also granted.

### F. Plaintiffs' Title IX Claims

Defendant Carroll Community School District also seeks summary judgment on plaintiffs' claims brought under Title IX, arguing that plaintiffs have not proffered sufficient evidence on each element of their Title IX claims to survive summary judgment. Specifically, the District asserts that plaintiffs cannot establish that it was deliberately indifferent to their harassment, that it had knowledge of the sexual harassment before October 2, 2003, or that the alleged acts were sufficiently severe and pervasive so as to deprive plaintiffs of access to educational opportunities or benefits provided by the school.

Title IX provides in pertinent part that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . .

20 U.S.C. § 1681(a).[3]

In *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 653 (1999), the United States Supreme Court held that recipients of federal funding, such as defendant the

---

[3] The United States Supreme Court has determined that Title IX is enforceable through an implied private right of action, *see Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979), and that monetary damages are available in such a private cause of action. *See Franklin v. Gwinnett County Pub. Schs*, 503 U.S. 60, 76 (1992).

32

District, may be liable under Title IX for student-on-student sexual harassment. In *Davis*, the Court held that a plaintiff bringing a Title IX claim against a recipient of federal funding based on student-on-student harassment is required to establish the following elements: 1) the funding recipient had actual knowledge of the sexual harassment in its programs or activities; 2) the funding recipient was deliberately indifferent to the sexual harassment and the harasser is under the funding recipient's disciplinary authority, and 3) the harassment was "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633; *see Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 258-59 (6th Cir. 2000) (citing *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999)); *see also Jennings v. University of N.C.*, ---F.3d---, 2007 WL 1040592, at *4 (4th Cir. Apr. 9, 2007) (holding that "[t]o establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution."); *Williams v. Board of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007) (holding that a plaintiff seeking recovery for violation of Title IX based on student-on-student harassment must prove four elements: that defendant is a Title IX funding recipient; that an "appropriate person" must have actual knowledge of the alleged harassment; that the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities; and, that the discrimination must be so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit).

33

## 1.  The District's knowledge of the harassment

The District asserts that plaintiffs cannot establish that it had knowledge of the alleged sexual harassment until October 2, 2003, after which the District asserts that it responded to plaintiffs' complaints in accordance with its policy against sexual harassment. In response, plaintiffs assert that the District had actual knowledge of plaintiffs' claims of sexual harassment on April 2, 2003, when plaintiffs notified Watson, the school's counselor, of their harassment at the hands of male classmates.

With respect to the knowledge requirement, in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), in which the United States Supreme Court addressed when a school district may be held liable for damages in an implied right of action under Title IX for the sexual harassment of a high school student by one of the district's teachers, the Court held that an "appropriate person" must have actual knowledge of the alleged harassment. *Id.* at 290; see *Williams*, 477 F.3d at 1293 (applying *Gebser*'s "appropriate person" requirement to a student on student harassment claim). The Court instructed that:

> An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Gebser*, 524 U.S. at 290.

Here, there is no dispute that Cordes, as the middle school principal, would constitute such an "appropriate person." Moreover, the court has little difficulty concluding that a material fact question has been generated as to whether Cordes learned

34

of the alleged harassing conduct in April of 2003. As noted above, the court is required to view all the facts in the light most favorable to plaintiffs, as the nonmoving party, giving them the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Quick*, 90 F.3d at 1377. Viewing the record in such a manner, the court notes that in April of 2003, plaintiff Rachael Dixon reported to Watson, the school's counselor, that Steven Kanealy, Jerry Letze and other boys were twisting girls' breasts. Rachael told Watson that plaintiff Heather Bruning was also receiving "titty twisters." This conduct was largely occurring during recess. At some point in April of 2003, Watson told Cordes about Rachael's sexual harassment complaint. When Watson went to find the named harassers she learned that Cordes was already meeting with the boys to discuss the behavior. The boys were scolded for giving "titty twisters" and other inappropriate behavior, and warned about punishments for such actions. The boys were given one day of detention and Cordes made a telephone call to their parents. On April 4, 2003, Cordes wrote a letter to Steven Kanealy's parents informing them of the inappropriate behavior and telling them that it must stop immediately. Cordes specifically wrote:

> Recently I have had some reports of students pinching and poking each other in the chest/breast. Steven's name came up as a person doing some of the pinching and poking. This type of behavior is inappropriate and unacceptable.

> In addition, some of the students have been talking about topics of the [sic] sexual nature that are inappropriate at school. When I met with Steven, he was honest with me about his involvement. I have given all students involved a warning for their actions. I also informed them that this type of behavior needed to <u>STOP</u> immediately.

> I am enclosing a copy of the harassment policy. Please review

35

the entire policy with Steven.

Thank you for your assistance in this matter.

Cordes's letter of April 4, 2003, at 1, Plaintiffs' App. at 416 (emphasis original).

Cordes's letter clearly indicates that he had knowledge of at least some of the harassing conduct by male classmates which was directed at plaintiffs. Therefore, the court concludes that plaintiffs have created a material question of fact that an "appropriate person" in the District had actual knowledge of Steven Kanealy, Jerry Letze, and Chris Barthman's harassing of plaintiffs in April of 2003.

### 2. *Was the District deliberately indifferent to the harassment?*

The District asserts that it is entitled to summary judgment on plaintiffs' Title IX claims because plaintiffs cannot establish that it was deliberately indifferent to plaintiffs' claims of sexual harassment at the hands of Steven Kanealy, Jerry Letze, and Chris Barthman. In response, plaintiffs assert that they have presented sufficient evidence to support their claim that the District's response to the harassment was clearly so unreasonable as to constitute deliberate indifference to the harassment.

In *Davis*, the Supreme Court held a Title IX defendant is liable for damages only where the defendant funding recipient itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment. *See Davis*, 526 U.S. at 642. "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis*, 526 U.S. at 645. The Court instructed that funding recipients are deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Thus, under this standard,

> The recipient is not required to "remedy" sexual harassment
> nor ensure that students conform their conduct to certain rules,

36

but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648-649, 119 S. Ct. 1661. The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648, 119 S. Ct. 1661. The standard does not mean that recipients must expel every student accused of misconduct. *See id.* Victims do not have a right to particular remedial demands. *See id.* Furthermore, courts should not second guess the disciplinary decisions that school administrators make. *See id.*

*Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000). The Court in *Davis* also observed that, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

In this case, the court concludes that genuine issues of material facts exist such that the court is not in a position at this juncture to declare that the District's actions were not clearly unreasonable as a matter of law. By way of example, the court notes that Cordes did not investigate nor determine the exact nature of the boys harassment of plaintiffs in April of 2003. Rather, Cordes admits that he visited with Steven Kanealy and Steven admitted to calling the girls names but denied poking them in the breasts. Cordes indicated that a denial of the complaint to poking the girls in the breast "most times" would lead to further investigation but Cordes felt that Steven had already admitted to violating the sexual harassment policy through the name calling, so Cordes made Steven's parents aware of the complaints through his letter of April 4, 2003. The seriousness of the physically harassing conduct that the boys were accused of here, poking or twisting the breasts of plaintiffs, is reflected by the fact that these same actions, if committed by a person over

37

the age of fifteen, would constitute indecent conduct with a child under Iowa law. *See* IOWA CODE § 709.12. Despite the seriousness of the allegations of harassment, the District did not avail itself of the use of the services of Gary Bengtson, a level one investigator, who has been the designated investigator for student-to-student harassment ever since the peer-on-peer sexual harassment policy was implemented in 2000 or 2001. Indeed, he has never been involved in any investigation of peer-on-peer sexual harassment.[4] Here, however, the District did not determine whether the physically harassing conduct alleged by plaintiffs occurred. Thus, Cordes's response to plaintiffs' complaints of harassment was based only on what Steven admitted and not on what actually occurred. Therefore, the court concludes that in the face of the seriousness of the allegations, when considered in conjunction with the lack of any meaningful investigation into whether the alleged physical harassment occurred, the District's response to plaintiffs' complaints of harassment could be found to be so inadequate as to be clearly unreasonable.

### 3. *Severity and pervasiveness of harassment*

As noted above, the third requirement for a claim of sexual harassment to be actionable under Title IX is that the sexual harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. As the Court

---

[4]Had Bengtson ever been called on to perform an investigation on plaintiffs' complaints, he would have brought in plaintiffs and talked to them. He would have also talked to any witnesses who were involved and, if the witnesses had no objections, tape recorded the statements. In addition, he would have brought in anyone with knowledge of the incident and interviewed them to see if their stories meshed or corroborated each other's stories. When the investigation was complete, he would have filed a written report. Bengtson's final step would have been to inform the principal regarding whether or not he believed that the harassment had ocurred.

in *Davis* instructed:

> Whether gender-oriented conduct rises to the level of actionable "harassment" thus "depends on a constellation of surrounding circumstances, expectations, and relationships," *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S. Ct. 998, 140 L. Ed.2d 201 (1998), including, but not limited to, the ages of the harasser and the victim and the number of individuals involved, *see* OCR Title IX Guidelines 12041-12042. Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. *See, e.g.,* Brief for National School Boards Association et al. as Amici Curiae 11 (describing "dizzying array of immature . . . behaviors by students"). Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Davis*, 526 U.S. at 651-52.

With respect to this element, the District contends that plaintiffs' alleged harassment was not sufficiently severe and pervasive to be actionable under Title IX because plaintiffs were not deprived of educational opportunities because of the harassment. The District asserts that this is demonstrated by the fact that there was not a noticeable change in plaintiffs' grades or in their attendance. Plaintiffs counter that substantial questions of material fact exist as to whether the alleged sexual harassment experienced by them was

so severe, pervasive, and objectively offensive as to deprive them of the educational opportunities and benefits provided by Carroll Middle School.  Plaintiffs point to the prolonged nature of the harassment and assert that they have generated material issues of fact as to whether the harassment resulted in their developing psychological and emotional conditions which affected their ability to take advantage of the educational opportunities offered by the District.

In this case, the court has little difficulty in concluding that the conduct alleged was pervasive since it continued to occur with some frequency over a period of several months during two different grades. The alleged conduct also meets the severity requirement since it included sexually explicit and vulgar language and repeated acts of objectively offensive touching or sexual groping which plaintiffs assert was unwelcome and intimidating. Indeed the conduct here is similar in kind to that found by the Sixth Circuit Court of Appeals in *Vance* to be sufficient to meet the severity and pervasiveness requirement. *Vance*, 231 F.3d at 259.  In *Vance*, the plaintiff submitted evidence that on one occasion, she was stabbed in the hand with a pen and that on another, two male students held her while others tried to pull off her shirt, pulled her hair, and another male classmate started to disrobe.  *Id.* at 256.  In addition to these two physical attacks, evidence was presented that plaintiff was subjected to "verbal propositioning and name calling."  *Vance*, 231 F.3d at 259.  Subsequent to these events, the plaintiff was diagnosed with depression.  *Id.* Here, plaintiffs allege that they were subjected to having their breasts and buttocks grabbed on repeated occasions by Steven, Jerry, and Chris.  In addition, plaintiffs allege that they had laser pointers aimed at her private areas, they were kicked, shocked with a shocking pen, poked in their crotch areas with pens and pencils, spat on, had their hair pulled, were scratched by staples, had their heads pulled down to the boys' crotches, had spitballs shot at them on the school bus, and that the boys would put their legs between the girls'

40

crotches during lunch and look under the table to see between the girls' legs.

Moreover, the court concludes that genuine issues of material fact have been generated by plaintiffs as to whether the alleged conduct had a systemic effect on them which resulted in denying the girls equal access to education. Plaintiffs allege that, since the harassment, Courtney no longer participates in band, chorus, basketball, cheerleading and dance. She now participates in no activities. Similarly, since the harassment, Rachael no longer participates in cheerleading and track. Likewise, Heather is alleged to have stopped her participation in cheerleading, ballet, and jazz. In addition, plaintiffs allege that they have developed psychological and emotional conditions in the aftermath of the harassment. For instance, Courtney has allegedly started cutting herself and has suicidal thoughts. Rachael is alleged to have developed esteem issues while Heather experienced periods in which she was depressed, worried and anxious.

In sum, the court concludes that plaintiffs have proffered sufficient facts to generate genuine issues of material fact on each of the three parts of the *Davis* test. Therefore, the portion of defendants' motion for summary judgment concerning plaintiffs' Title IX claims is denied.

### G. Plaintiffs' Iowa Civil Rights Act Claims

The District also seeks summary judgment on plaintiffs' claims brought under the Iowa Civil Rights Act, Iowa Code § 216.9, asserting that plaintiffs have failed to demonstrate that they were denied access to the educational opportunities offered by Carroll Middle School. The District contends that because plaintiffs have not presented a separate argument with respect to their claims under the Iowa Civil Rights Act that the court should apply the same standard in addressing plaintiffs' claims under the Iowa Civil Rights Act as employed in addressing plaintiffs' claims under Title IX. Plaintiffs' respond

41

that the Iowa Civil Rights Act requires its own separate analysis and that the District has not established that the court should employ the analytical framework developed by the United States Supreme Court to address claims under Title IX for student-on-student sexual harassment.

The Iowa Civil Rights Act provides that:

> It is an unfair or discriminatory practice for any educational institution to discriminate on the basis of race, creed, color, sex, national origin, religion, or disability in any program or activity. Such discriminatory practices shall include but not be limited to the following practices:
>
> 1. Exclusion of a person or persons from participation in, denial of the benefits of, or subjection to discrimination in any academic, extracurricular, research, occupational training, or other program or activity except athletic programs;
> 2. Denial of comparable opportunity in intramural and interscholastic athletic programs;
> 3. Discrimination among persons in employment and the conditions of employment;
> 4. On the basis of sex, the application of any rule concerning the actual or potential parental, family or marital status of a person, or the exclusion of any person from any program or activity or employment because of pregnancy or related conditions dependent upon the physician's diagnosis and certification.
>
> For the purpose of this section "educational institution" includes any preschool, elementary, secondary, or community college, area education agency, or postsecondary college or university and their governing boards. This section does not prohibit an educational institution from maintaining separate toilet facilities, locker rooms or living facilities for the different sexes so long as comparable facilities are provided. Nothing in this section shall be construed as prohibiting any

42

> bona fide religious institution from imposing qualifications
> based on religion when such qualifications are related to a
> bona fide religious purpose or any institution from admitting
> students of only one sex.

Iowa Code § 216.9.

The Iowa Supreme Court has never addressed a private damages action against an educational institution under the Iowa Civil Rights Act for student-on-student harassment. Needless to say, no Iowa appellate court has set forth the appropriate framework to be employed in considering a claim under the Iowa Civil Rights Act for student-on-student sexual harassment. Nonetheless, the court notes that the Iowa Supreme Court has found federal cases persuasive in selecting the analytical framework for deciding discrimination cases under the Iowa Civil Rights Act. *See Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 677-78 (Iowa 2004); *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003); *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989); *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983); *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n*, 322 N.W.2d 293, 296 (Iowa 1982); *Foods, Inc. v. Iowa Civil Rights Comm'n*, 318 N.W.2d 162, 168 (Iowa 1982); *First Judicial Dist. Dep't of Corr. Servs. v. Iowa Civil Rights Comm'n*, 315 N.W.2d 83, 87 (Iowa 1982); *Linn Co-op Oil Co. v. Quigley*, 305 N.W.2d 729, 736 (Iowa 1981); *Cedar Rapids Cmty. Sch. Dist. v. Parr*, 227 N.W.2d 486, 492 (Iowa 1975). The court notes that under the plain language of this portion of the Iowa Civil Rights Act, that Act's prohibition against discrimination in educational programs or activities is open ended and unrestricted as to any specific discriminatory acts. Because Title IX and the Iowa Civil Rights Act both share halting discrimination in the education as a central tenant, the court concludes that the Iowa Supreme Court would adopt the analytical framework developed by the United States Supreme Court in *Davis* to address claims under the Iowa Civil Rights Act for

43

student-on-student sexual harassment. Because plaintiffs' educational discrimination claims under Iowa Code § 216 are premised on the same factual bases as their Title IX claims, for the reasons discussed above with respect to plaintiffs' Title IX claims, the court concludes that plaintiffs have proffered sufficient facts to generate genuine issues of material fact on each of the three parts of the *Davis* test. Therefore, the portion of defendants' motion for summary judgment concerning plaintiffs' claims under the Iowa Civil Rights Act is also denied.

### H. Plaintiffs' Iowa Tort Claims

The District also seeks summary judgment on plaintiffs' Iowa state law tort claims for negligence, premises liability and failure to protect. The District asserts that it was exercising discretionary function in disciplining students and is therefore immune from liability for plaintiffs' tort claims under the Iowa Municipal Tort Claims Act, Iowa Code § 670.4. The District further argues that it has not breached any duty to protect plaintiffs from student-on-student harassment. Finally, the District contends that plaintiffs allegations are insufficient as a matter of law to support a claim for premises liability. Plaintiffs respond that the District is not shielded from immunity by the discretionary function defense under the Iowa Municipal Tort Claims Act.

#### 1. Immunity under Iowa Municipal Tort Claims Act

Under Iowa law, "every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function." IOWA CODE § 670.2. By definition, "municipality" includes a school district. IOWA CODE § 670.1; *see Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 67 (Iowa 2002). "Municipalities are, however, statutorily immune from liability for '[a]ny claim based upon . . . the exercise or

44

performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion is abused.'" *Id.* (quoting Iowa Code § 670.4(3)). As the Iowa Supreme Court has observed:

> Commonly known as the "discretionary function exception," this immunity is intended to "prevent judicial 'second guessing' of . . . administrative decisions grounded in social, economic, and political policy" through tort litigation, thereby protecting municipalities "from liability that would seriously handicap efficient government operations."

*Id.* (quoting *Goodman v. City of LeClaire*, 587 N.W.2d 232, 237 (Iowa 1998) and *United States v. Varig Airlines*, 467 U.S. 797, 813-14 (1984)). The Iowa Supreme Court has explained the analysis it employs in determining whether the discretionary function exception is applicable as follows:

> We apply a two-step analysis to each specification of negligence to determine whether the . . . challenged actions fall within the discretionary function exemption, inquiring (1) whether the action in question was a matter of judgment or choice for the acting employee and (2) whether, if an element of judgment is involved in the challenged conduct, the judgment is of a kind that the discretionary function exception was designed to shield. *Goodman v. City of Le Claire*, 587 N.W.2d 232, 237-38 (Iowa 1998) (citing *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed.2d 531 (1988)). If the answer to either question is "no," the discretionary function exemption does not apply.

*City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.*, 617 N.W.2d 11, 19 (Iowa 2000).

A discretionary function generally involves the evaluation of broad policy factors such as the financial, political, economic, and social effects of a given plan or policy. *See Keystone Elec. Mfg., Co. v. City of Des Moines*, 586 N.W.2d 340, 347 (Iowa 1998). Thus, in *Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62 (Iowa 2002), the Iowa

45

Supreme Court framed the two-part analysis as being: " (1) Did the challenged conduct involve an element of choice or discretion? (2) If discretionary judgment was involved, was the decision or course of action driven by public policy concerns grounded on social, economic or political considerations?" *Id.* at 68. Because liability is the rule and immunity the exception, the Iowa Supreme Court placed the burden of proof on the government entity to establish entitlement to the statute's protection. *Schmitz v. City of Dubuque*, 682 N.W.2d 70, 73 (Iowa 2004); *Ette*, 656 N.W.2d at 68; *Doe v. Cedar Rapids Cmty. Sch. Dist.*, 652 N.W.2d 439, 446 (Iowa 2002). Moreover, the court notes that the Iowa Supreme Court has recognized that because the origins of the discretionary function exception flow from the federal tort claims act, Iowa courts are "guided by federal decisions applying its mandate." *Ette*, 656 N.W.2d at 68 (citing *Shelton v. State*, 644 N.W.2d 27, 30 (Iowa 2002)).

The first part of the test is plainly satisfied in this case. Plaintiffs do not dispute that the District's rules clearly vested discretion in Cordes in determining a response to plaintiffs' claims of sexual harassment. The dispute in this case centers on the second prong of the test, were Cordes's decisions or course of action "driven by public policy concerns grounded on social, economic or political considerations?" *Ette*, 656 N.W.2d at 68. Here, the District has not identified any social, economic or political considerations that were instrumental in Cordes's decisions or course of action. Thus, the District has failed to establish its entitlement to immunity. Moreover, the court notes that the challenged conduct in this case is not merely Cordes's disciplinary decision with respect to the harassers but the District's course of conduct which permitted plaintiffs to be subjected to repeated acts of harassment. That course of conduct is not one driven by public policy implications uniquely within the purview of the District's officials and employees. In fact, the policy governing such conduct is well settled, as the Iowa Supreme

46

Court has observed that:

> "The law charges school districts with the care and control of children and requires the school district to exercise the same standard of care toward the children that a parent of ordinary prudence would observe in comparable circumstances."

*Godar v. Edwards*, 588 N.W.2d 701, 708 (Iowa 1999) (quoting *Burton v. Metropolitan Transit Auth.*, 530 N.W.2d 696, 699 (Iowa 1995)). In *City of Cedar Falls*, the Iowa Supreme Court held that the acts of a kindergarten teacher in supervising her class during a field trip were not protected by the discretionary function exception even when involving matters of judgment. *City of Cedar Falls*, 617 N.W.2d at 19. Similarly, in *Ette*, the Iowa Supreme Court once again held the discretionary function immunity was not available for a school district. *Ette*, 656 N.W.2d at 70. In *Ette*, the question at issue was whether the school's decision to send a student, who was on a school sponsored event in Texas, home alone on a long bus trip for a violation of school rules was a judgment call driven by social, economic, or political concerns. *Id*. at 68. The Iowa Supreme Court concluded that it was not, because to do so would obviate the school's duty to supervise the student and protect him from reasonably foreseeable risks. *Id*. at 69. Likewise, to grant the District immunity here under the discretionary function exception would act to nullify the District's duty to supervise plaintiffs and protect them from reasonably foreseeable risks. Therefore, the court concludes that the District has failed to meet its burden at this juncture to show that it is immune from liability for its course of conduct in this case under the discretionary function exception. Therefore, this portion of defendants' motion for summary judgment is also denied.

## 2. Breach of duty to protect plaintiffs

The District also asserts that it is entitled to summary judgment on plaintiffs' state law tort claims because it did not breach any duty it had to plaintiffs to protect them from

student-on-student harassment. Plaintiffs respond that they have generated genuine issues of material fact which preclude granting this portion of defendants' motion.

The court need not tarry long on this issue. As noted above, the Iowa Supreme Court has repeatedly recognized that Iowa school districts have a duty with respect to the care and control of children which requires them "to exercise the same standard of care toward the children that a parent of ordinary prudence would observe in comparable circumstances." *Godar*, 588 N.W.2d at 708; *see Ette*, 656 N.W.2d at 69. A school district's duty to supervise its students and protect them from harm is not unlimited but rather is limited to reasonably foreseeable risks. *Ette*, 656 N.W.2d at 69; *Godar*, 588 N.W.2d at 708. Here, the court concludes that plaintiffs have generated genuine issues of material fact concerning whether the risk of harm to plaintiffs was reasonably foreseeable. For instance, the parties dispute whether Hoth and Cordes each witnessed certain acts of harassment, prior to plaintiffs' first report of harassment to Watson, but that Cordes and Hoth did not intervene. This dispute goes directly to both the reasonableness of the care exercised by the District as well as the foreseeability of harm to plaintiffs from the alleged harassment. Moreover, the court notes that it is generally the task of the jury to determine the reasonableness of the care exercised by a defendant in light of the foreseeability of harm. Accordingly, this portion of defendants' motion for summary judgment is also denied.

### 3. *Premises Liability*

The District also seeks summary judgment on plaintiffs' premises liability claim, contending that plaintiffs have failed to generate a genuine issue of material fact on their claim. Plaintiffs respond that they have generated a genuine issue of material fact as to whether harm to plaintiffs caused by physical assaults at Carroll Middle School was reasonably foreseeable.

48

Plaintiffs seek to impose liability on the District for plaintiffs injuries under Restatement (Second) of Torts, section 344, at 223-24 (1965), which provides:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>> (a) discover that such acts are being done or likely to be done, or
>> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise protect them against it.

RESTATEMENT (SECOND) OF TORTS § 344, at 223-24 (1965). Comment f to section 344 discusses the case of an injury to a visitor caused by a third party:

> Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

RESTATEMENT (SECOND) OF TORTS § 344 comment f, at 225-26.

Thus, under Restatement § 344, a duty of care is owed by a possessor of land to members of the public to protect them against physical harm caused by the acts of third

persons. Iowa appellate courts have looked to this section of the Restatement (Second) of Torts for guidance in determining whether a possessor of land may be held liable to visitors for acts committed by third parties. *See Summy v. City of Des Moines*, 333, 340-42 (Iowa 2006); *Knebel v. Ka-Boos Bar & Grill*, 680 N.W.2d 379, 2004 WL 360490 at *2 (Iowa Ct. App. 2004) (table decision); *Galloway v. Bankers Trust Co.*, 420 N.W.2d 437, 438 (Iowa 1988); *Martinko v. H-N-W Assocs.*, 393 N.W.2d 320, 321 (Iowa 1986).[5] As the Iowa Supreme Court has noted, "[t]he nub of this section is foreseeability". *Martinko*, 393 N.W.2d at 321; *Tenney v. Atlantic Assocs.*, 594 N.W.2d 11, 18 (Iowa 1999) (noting that premises liability under Restatement section 344 presupposes foreseeability).

Here, the court concludes that plaintiffs have generated genuine issues of material fact as to whether a reasonable person could foresee injury to plaintiffs or other female students arising from the physical harassment and sexual misconduct of Steven Kanealy, Chris Barthman, and Jerry Letze on the Carroll Middle School premises. For instance, plaintiffs have submitted evidence, which if believed by the fact finder, establishes that before their eighth grade year, the District was on notice that Steven Kanealy, Chris Barthman, and Jerry Letze posed a particular threat to the physical well-being of plaintiffs and other female classmates at the school. Plaintiffs have offered evidence establishing,

---

[5]The court notes that other state courts have relied upon Restatement (Second) of Torts § 344 (1964) in determining whether a school or other educational institution has a duty to protect students from the actions of third parties. *See Nero v. Kansas State Univ.*, 861 P.2d 768, 777-78 (Kan. 1993); *Fazzolari ex rel Fazzolari v. Portland Sch. Dist. No. 1*, 734 P.2d 1326, 1337 (Or. 1987); *Peterson v. San Francisco Cmty. Coll. Dist.*, 685 P.2d 1193, 1197-98 (Cal. 1984); *Furek v. University of Del.*, 594 A.2d 506, 520-21 (Del. 1991); *Brown v. North Carolina Wesleyan Coll.*, 309 S.E.2d 701, 702 (N.C. Ct. App. 1983); *Setrin v. Glassboro State Coll.*, 346 A.2d 102, 106 (N.J. 1975).

Case 3:04-cv-03091-MWB   Document 134   Filed 04/19/07   Page 50 of 51

before the eighth grade, that Steven Kanealy, Chris Barthman, and Jerry Letze engaged in acts of physical harassment and sexual misconduct on the school's premises. Moreover, plaintiffs have generated a genuine issue of material fact on the issue of whether Hoth and Cordes personally witnessed certain acts of physical harassment but took no action to halt it. Thus, the court concludes that because plaintiffs have generated genuine issues of material fact concerning whether the risk of harm to plaintiffs was reasonably foreseeable, this portion of defendants' motion is also denied.

## III.  CONCLUSION

For the reasons discussed above, defendants' Motion For Summary Judgment is granted in part and denied in part. Specifically, defendants' motion is granted as to plaintiffs' substantive due process claim, equal protection claim, and claims brought under 42 U.S.C. § 1983. Moreover, the court grants defendants' motion as to the claims against defendants Schultz, Cordes and Hoth on the ground that they are entitled to qualified immunity. Defendants' motion is denied as to plaintiffs' Title IX claims as well as their Iowa state law tort claims for negligence, premises liability and failure to protect.

**IT IS SO ORDERED.**

**DATED** this 19th day of April, 2007.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA